Cicero A. Ramsey, a duly licensed real estate agent, sued Harry Bros. Co. of La., a corporation, the name of which, by charter amendment, has been changed to Iron Steel Products Co., Inc., claiming $1,000 as a commission to which he alleges he is entitled because of the sale by defendant company to Shell Petroleum Corporation of certain real estate situated in New Orleans. Plaintiff alleged in effect that he was given the exclusive contract to find a purchaser for the said property and that it was through his efforts that the sale was consummated. He averred that the property was sold for $25,000, and that the usual and customary commission in this community is 4% of the amount of the sale and that, therefore, he is entitled to judgment for $1,000. Defendant company denied that plaintiff had been granted an exclusive contract to procure a purchaser for the property and also denied that the sale was effected through the efforts of plaintiff.
There was judgment for plaintiff as prayed for and defendant has appealed.
The record shows that Mr. Jesse Cave, at that time vice-president and general manager of defendant company, and plaintiff, Ramsey, were quite friendly and that on one occasion, while they were playing golf, Cave mentioned to Ramsey that his company would like to dispose of a portion of its real estate holdings on Carrollton Avenue. Ramsey claims that a few days later, having submitted the said property to New Orleans Refining Company, he wrote that company a letter on April 2, 1929, enclosing a sketch of the property and, on behalf of the owners, offering to sell a certain portion of the said property.
Ramsey then wrote to Mr. Cave, enclosing a copy of his letter submitting the property to the New Orleans Refining Company, and, on the next day, April 3, 1929, Cave, as vice-president and general manager of the defendant company, wrote to Ramsey a letter reading as follows:
"New Orleans, La., "April 3, 1929
"Mr. Cicero A. Ramsey, "833 Perdido St., "City.
"Dear Sir:
"Replying to yours of April 2nd. in which you notify us that you have called the attention of the N.O. Refining Co. to our property on Carrollton Ave., should we receive the inquiry from anyone else we will protect you as is customary in such cases.
"Respectfully, "Harry Bros. Co. of La. "Per J.S. Cave
"JSC:B. V.P. G.M."
Later, apparently during August, 1929, other real estate agents, David and Ray Loker, learning that the Shell Petroleum Corporation was, or might be, interested in filling station sites in New Orleans, approached representatives of that company and prevailed upon them to inspect certain sites which might be desirable. Among the locations inspected was that of the defendant company. The representatives of the Shell Petroleum Corporation were interested in the property, and Mr. Ray Loker called upon the defendant company and suggested to Mr. Cave that he had found a prospective purchaser. At his conference with Mr. Cave there were present two representatives of the Shell Petroleum Corporation. An agreement was reached under which the property was later sold to the Shell Petroleum Corporation, and the usual commission was paid by the defendant company to the Messrs. Loker.
It is now conceded by the defendant company that the New Orleans Refining Company is a wholly owned subsidiary of the Shell Petroleum Corporation. Mr. Ramsey seems to have been fully aware of this connection between these corporations though there is nothing in the record which shows that Mr. Cave or any of the officials of the defendant company had any knowledge of it.
It is conceded by counsel for defendant that if the contract between Ramsey and *Page 761 
the defendant company constituted an exclusive contract with the former, he would have been entitled to the usual commission on any sale made within a reasonable time, whether Ramsey was the procuring cause or not. Also there seems to be no doubt that even if the contract was not an exclusive one, Ramsey would be entitled to a commission if his efforts were responsible for the transaction which was consummated.
Let us first dispose of plaintiff's contention that he was the procuring cause of the sale; that it resulted from his efforts. The record shows, we think conclusively, that the other agents were solely and entirely responsible for that sale. It is true that it was through Ramsey that the New Orleans Refining Company first became interested in the property, but it is quite evident that that interest had waned and, in fact, had disappeared altogether when, several months later, Mr. Loker broached the subject of that particular property to the Shell Petroleum Corporation, and from that time we conclude that Mr. Ramsey had no part whatever in the negotiations between the defendant company and the Shell Petroleum Corporation.
Though Mr. Ramsey says that he first interested Mr. Deveney, representing the New Orleans Refining Company, and that later it was the same Mr. Deveney as the representative of the Shell Petroleum Corporation who closed negotiations, Mr. Deveney, himself, said: "I have no recollection of negotiating with or through Mr. Cicero A. Ramsey at the time in question either on behalf of the New Orleans Refining Company or the Shell Petroleum Corporation for or concerning the property described in the interrogatory." We think it evident that it was not as a result of the fact that plaintiff originally brought the property to the attention of the New Orleans Refining Company, the subsidiary, that later the Shell Petroleum Corporation, the parent company, bought it.
Unless then Ramsey had been granted an exclusive contract, he is not entitled to recover a commission on the sale which was not effected by him. It may be, of course, that if he was given the exclusive right to deal with a certain prospective purchaser and that prospective purchaser later bought the property, he would be entitled to his commission and this feature we shall later discuss.
The contract on which Ramsey relies grows out of the letter of April 3, 1929, written to him by Mr. Cave as vice-president and general manager of defendant company, which letter we have already quoted. We direct attention particularly to the rather peculiar use of the word "the" before the word "inquiry". Strangely enough, counsel for both parties in their briefs have inadvertently misquoted this letter but, apparently, have not noticed the significance of the word "the" before the word "inquiry". Counsel for Ramsey in their brief say that the letter reads as follows: "should we receive an inquiry from anyone else we will protect you as is customary in such cases." Counsel for defendant company quote that part of the letter as follows: "should we receive inquiry from anyone else we will protect you as is customary in such cases." The word "the" is significant, and in view of the previous reference to the fact that the property had been called to the attention of the New Orleans Refining Company, we think that the word "the" indicated that what Mr. Cave meant was that if the inquiry of the New Orleans Refining Company should come to his company through any other agent he would consider that Mr. Ramsey had first interested New Orleans Refining Company, and, therefore, would protect him insofar as the commission might be concerned. It is quite evident that that was what Mr. Cave thought that he was saying in his letter, for when he was placed on the stand as a witness and was asked what he meant in that letter, in spite of the fact that the letter was incorrectly quoted to him, and that he was asked whether he had not written a letter to Mr. Ramsey stating: "In case we have any inquiry from anyone else, you will be protected." He said: "My recollection is that referred to if we had inquiry through somebody else for that property from the New Orleans Refining Co., we would take care of him." And, a little later, he made his appreciation of that letter even more clear, saying that when he had written the letter "* * * I took it in case — If you just ask for my opinion, what I was thinking, my recollection is along the line that if the New Orleans Refining Co. had made an inquiry through some other source and asked for that piece of property, I would think our company owed Mr. Ramsey a commission on it. * * *" *Page 762 
We have no doubt at all that if Mr. Cave had not been misled by the inadvertent misquotation of the letter when he was told that, in his letter, he had said that if he had "any" inquiry from anyone else he would protect Mr. Ramsey, and if he had been told correctly what his letter had actually stated, he would have been even more positive in his opinion that what he had intended to say was that if the New Orleans Refining Company made inquiry through any other agent he would protect Mr. Ramsey. That that is what he actually meant becomes very clear when we recollect that when he wrote the letter no suggestion had been made that Mr. Ramsey be given an exclusive contract. As a matter of fact, Mr. Cave stated that either then or shortly thereafter several other agents were working on the proposition, and were attempting to find a purchaser for the property. It is clear then that Mr. Ramsey had opened negotiations with the New Orleans Refining Company without having obtained an exclusive contract, and that he was perfectly willing on that basis to attempt to find a purchaser. Why then should Mr. Cave, in acknowledging receipt of Mr. Ramsey's letter stating that the property had been offered to the New Orleans Refining Company, go much further than the necessity of the situation demanded, and not only acknowledge that Mr. Ramsey had submitted the property to that company, but also volunteer the statement that Mr. Ramsey should be considered the exclusive agent for the sale of the property — for that is what plaintiff's interpretation of the letter implies.
In view of those circumstances, and in view of the peculiar wording of the letter, we reach the conclusion that Mr. Cave had no intention of granting to Mr. Ramsey an exclusive contract, and that Mr. Ramsey did not demand any such exclusive contract, and that all that Mr. Cave meant to say was that if the property should be sold to New Orleans Refining Company he would protect Mr. Ramsey because of the fact that he had first brought that company into the negotiations.
This leaves for consideration only the one very interesting question of whether the fact that the Shell Petroleum Corporation wholly owns and controls the New Orleans Refining Company entitles Mr. Ramsey to his commission because of the fact that in Mr. Cave's letter to Mr. Ramsey he said that he would protect him if the property should be sold to the company to which Mr. Ramsey had submitted it. It is true that it is conceded by counsel for defendant that New Orleans Refining Company is a wholly owned subsidiary of Shell Petroleum Corporation which ultimately bought the property. But unless it is made to appear that the officers of the defendant company knew this, or ought to have known it, we see no reason to hold that when they, in good faith, sold the property to another corporation, and paid the commission to another agent, they should be liable to Mr. Ramsey.
As we have already shown, there is nothing in the record which shows that anyone connected with defendant company knew of the relationship between the two other corporations. Surely, Mr. Ramsey made no effort to advise Mr. Cave that the two corporations were, in effect, the same and he claims that he was well aware of this fact. He was asked: "In your conversations with Mr. Cave did you and he discuss anything about the relationship between those two companies?" His answer was: "At that time, I didn't know anyone except the Shell Petroleum Corporation." Yet in his letter he referred only to New Orleans Refining Company. Later he admitted that he did not know whether Mr. Cave knew of the connection between the two companies —
"Q. Do you know whether Mr. Cave at that time knew anything about this connection? A. What do you mean by connection?
"Q. Between the Shell Petroleum Co. and New Orleans Refining Co.? A. I don't know."
Mr. Pannell, who on June 25, 1929, became assistant secretary and assistant manager of the defendant company, says positively that he knew nothing about it, and Mr. Cave, though he admits the possibility that he may have heard of the connection, says that he gave it no thought, and that he really believes that he did not learn of the relationship until later — "when Mr. Ramsey claimed a commission on this sale." It is said that the fact that the two corporations were affiliated was common knowledge in this community. That may or may not be true, nevertheless the two corporations are separate and distinct legal entities.
Mr. Ramsey claims a commission on the sale to the Shell Corporation because *Page 763 
of the fact that defendants agreed to pay him a commission should the property be sold to New Orleans Refining Company. The burden rests upon him to show not only that the two corporations were in effect the same, but also that defendants knew it or ought to have known it. He has failed to show this.
In view of Mr. Cave's statement that his recollection is that he did not know of the connection until after the transaction had been consummated, and in view of Mr. Pannell's statement that he did not know of it at all, to hold defendant company liable would imply that defendants, in selling the property directly to the Shell Petroleum Corporation, were attempting, through a subterfuge, to deprive Mr. Ramsey of his commission, and there is nothing in the record which justifies, to any extent, the conclusion that this was their purpose.
Under all the circumstances, we feel that Mr. Ramsey is not entitled to a commission on this transaction.
Therefore the judgment appealed from is annulled, avoided and reversed and plaintiff's suit is dismissed at his cost.
Reversed and dismissed.